Barckley A. STOREY and Martha Storey, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 1368.

United States District Court
E. D. Kentucky.
April 21, 1961.

William R. Bagby, Lexington, Ky., for plaintiffs.

Jean L. Auxier, U. S. Atty., Lexington, Ky., Charles K. Rice, Asst. Atty. Gen., James P. Garland, Jerome Fink, Melvyn I. Mark, Attys. Dept. of Justice, Washington, D. C., for the United States.

HIRAM CHURCH FORD, Chief Judge.

By this action the plaintiffs, Barckley A. Storey and his wife Martha Storey, seek to recover Internal Revenue tax alleged to have been erroneously assessed and collected from them for the year 1954, 28 U.S.C.A. § 1346(a) (1).

The facts which give rise to this litigation are set out in the stipulation made and entered into by counsel for the parties, as follows:

"1. This suit is for the recovery of Federal income tax and interest for the calendar year 1954 and the basis of the jurisdiction of the Court is Title 28 U.S.C. Sec. 1346(a) (1). The plaintiffs are, and at all times pertinent hereto were, husband and wife and they are bona fide residents of Fayette County, Kentucky within the judicial district of the Court. The taxes and interest involved herein were paid and a timely claim for refund filed by plaintiffs was denied by the defendant.

"2. During 1938 Barckley A. Storey, one of the plaintiffs (referred to herein as the plaintiff), and one Frank J. Rees owned all of the outstanding stock of the Womwell Automotive Parts Company, a Kentucky corporation (referred to herein as the corporation).

"3. The corporation had been financially successful due to the hard work and abilities of the plaintiff and Rees, and the complete harmony which existed between these two men. During 1938 the plaintiff and Rees came to the realization that the death of either of them would result in complications which could seriously handicap the future progress of the corporation and of the value of the stock of the corporation owned by plaintiff and Rees (the stock of the corporation is referred to herein as the stock).

"4. In order to avoid the aforementioned trouble in the event of the death of either of them, the plaintiff and Rees on December 29, 1938 entered into a contract (referred to herein as the contract). Under this contract the survivor was given the absolute right to acquire the stock of the deceased from the estate of the deceased and the contract provided the financial arrangement by which the survivor could purchase that stock. (A true copy of the contract is attached hereto as Exhibit A and made a part hereof).

"5. Under the contract Rees agreed to secure and maintain an insurance policy on the life of the plaintiff with a face value of $95,000.00 and the plaintiff agreed to secure and maintain an insurance policy on the life of Rees with a face value of $90,000.00. In pursuance of the terms of the contract Rees insured the life of the plaintiff for $95,000.00 and the plaintiff insured the life of Rees for $90,000.00. Rees was named the beneficiary under the policy on the plaintiff's life and plaintiff was named the beneficiary under the policy on Rees' life.

"6. Under the contract, at the death of Rees or the plaintiff, the proceeds from the insurance on the life of the deceased were to be collected and used by the survivor to purchase for himself the stock of the deceased.

"7. The survivor was required to buy all of the stock of the deceased

up to a value equal to double the insurance proceeds received from the policy owned by the survivor on the life of the deceased. The survivor had the option to purchase any additional stock the deceased owned at his death. If the insurance proceeds were insufficient to pay for the stock required to be purchased, or insufficient to pay for the stock purchased, the contract provided that the survivor had to pay the balance of the purchase price either in cash or by executing his 4% notes payable to the estate of the deceased for the unpaid balance.

"8. The purchase price the survivor was required to pay for the stock was the book value of the stock at the time of the death of the deceased. However, the contract also required that the price to be paid the Rees Estate for his stock could be no less than $90,000.00 (the amount of insurance proceeds on Rees' life which plaintiff would receive) and the price to be paid the plaintiff's estate for his stock could be no less than $95,000.00 (the amount of insurance proceeds on plaintiff's life which Rees would receive).

"9. Under the contract, Rees was required to pay, and until his death he did pay, for the premiums for the policy on the life of the plaintiff; and the plaintiff was required to pay until the death of Rees, and he did pay, for the premiums for the policy on the life of Rees.

"10. The contract provided that upon the death of one of the parties the insurance policy on the life of the survivor, taken out, owned and maintained by the deceased, would become the property of the survivor without any charge of any kind. That is, if Rees died, the insurance policy on plaintiff's life, which Rees had taken out, owned and maintained by paying the premiums, was to become the property of the plaintiff. Similarly, if the plaintiff died first, the insurance policy on Rees' life, which plaintiff had taken out, owned and maintained by paying the premiums, was to become the property of Rees.

"11. During the lifetime of plaintiff and Rees, their contract could be terminated only by mutual agreement, the dissolution or bankruptcy of the corporation, or the lapse of the life insurance policies. In the event of any and every termination of the contract during their joint lives the ownership of the policy on plaintiff's life would automatically be transferred from Rees to plaintiff and the policy on Rees' life would automatically be transferred from plaintiff to Rees. In other words, Rees would become the owner of the policy on his own life and the plaintiff would become the owner of the policy on his own life.

"12. Rees died on June 4, 1953. The plaintiff being the survivor, purchased from the Rees Estate at book value the stock which Rees owned at his death. The book value of the stock Rees owned at his death was $180,000. The proceeds of $90,-000 received by plaintiff from the policy on Rees' life plus the funds plaintiff himself provided from other sources in the amount of $90,000 were used by plaintiff in making full payment for the stock to the Rees Estate pursuant to the contract. The Rees' stock was thereupon transferred to the plaintiff.

"13. Pursuant to the contract, upon the death of Rees, the policy on plaintiff's life, which was owned by Rees at his death, became the property of the plaintiff. The policy on his own life was thereupon delivered to the plaintiff. The cash surrender value of the life insurance policy on plaintiff's life was $29,069.59 at the time of Rees' death.

"14. In 1954 plaintiff sold some of the stock which he had acquired by purchase under the contract from the Rees Estate. In the computation of his gain on the sale, for his 1954 income tax return, plaintiff used as

the cost basis of the stock the amount of $180,000 which was the price he paid the Rees Estate. The Commissioner of Internal Revenue determined that the cost basis to plaintiff of such stock was $180,000 less $29,069.59, the cash surrender value of the insurance policy on plaintiff's own life which, under the contract, became the property of plaintiff at the death of Rees.

"15. In computing the plaintiff's capital gain on the sale of the stock in 1954, if the plaintiff's cost basis was $180,000, the Court should enter a judgment for the plaintiff for $3,-820.44 and $578.03, the amount of taxes and interest, respectively, paid by the plaintiffs to the defendant, plus interest on $3,820.44 from October 28, 1957, until paid, and interest on $578.03 from November 20, 1957, until paid.

"16. If the defendant was correct in reducing the basis claimed by plaintiff by the cash surrender value of the insurance policy on plaintiff's life at the death of Rees, a judgment should be entered for the defendant, dismissing the plaintiff's complaint with prejudice."

It thus appears that the only question for determination is whether, in computing the plaintiff's capital gain on the sale of stock in 1954, the Commissioner of Internal Revenue correctly determined that the real cost of the stock purchased by the plaintiff from the estate of his deceased partner was $150,930.41, the amount of the book value of the stock, $180,000, less $29,069.59, the cash value of the insurance policy acquired by plaintiff from the estate of his deceased partner under the terms of the contract, as set out in paragraph 13 of the stipulation, paragraph (g) of Clause Three of the contract.

Clause One of the contract attached to the stipulation as Exhibit "A", entitled "The Purpose of This Agreement", states the purpose of it in these words: " * * the Owners realize that the death of one of them will bring about complications which may seriously handicap the future progress of the business and of the value of each Owner's share holdings therein. The Owners agree that such an undesirable situation should and can be prevented, and in order to prevent the same, they have entered into this agreement and adopted the plan hereinafter set forth, whereby upon the death of an Owner the surviving Owner will acquire by purchase the deceased Owner's stock."

It seems quite clear that the transfer of the insurance policy, referred to in paragraph 13 of the stipulation (paragraph (g) of Clause Three of the contract), to the surviving partner was an integral part of the plan designed to prevent "the undesirable situation" envisioned by the partners.

It is apparent that the parties were highly competent business men and, in making the agreement, they were dealing with each other at arms length in order to resolve a business problem which both regarded as potentially serious.

Taxable gain resulting from the sale of property is the excess of the amount realized therefrom over an adjusted cost basis, Internal Revenue Code § 1001, 26 U.S.C.A. § 1001, and the adjusted basis for determining such gain is "the cost of such property", Internal Revenue Code §§ 1011, 1012, 26 U.S.C.A. §§ 1011, 1012.

In United States v. Phellis, 257 U.S. 156, 157, 168, 42 S.Ct. 63, 65, 66 L.Ed. 180, the Court said: "We recognize the importance of regarding matters of substance and disregarding forms in applying the provisions of the Sixteenth Amendment and income tax laws enacted thereunder."

In Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, 461, 79 S.Ct. 1270, 1279, 3 L.Ed.2d 1360, the Court reiterated this rule saying: "We agree, of course, that the incidence of taxation depends upon the substance, not the form, of the transaction * * *."

 In applying the rule that we must look to the substance rather than to the form, since it appears without dispute that under the contract the plaintiff

acquired from the estate of his deceased partner an insurance policy having the cash value of $29,069.59, such acquisition should be deducted from the $180,000 referred to in the contract as the purchase price at its book value, in order to determine the real cost to plaintiff, for, in reality, the amount which he was out of pocket in the purchase of the stock was reduced to that extent.

For the reasons indicated, I am of the opinion that the Commissioner correctly determined that the adjusted cost basis upon which to determine the plaintiff's taxable gain upon his sale of stock purchased from the estate of his deceased partner under the contract here involved was $180,000 less $29,069.59.

Judgment should be entered for the defendant dismissing the complaint.